**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GARY WEINBERG and BEVERLY WEINBERG,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| v. | : | **CIVIL ACTION** |
| | : | |
| | : | **NO. 11-cv-5680** |
| **NATIONWIDECASUALTY AND INSURANCE COMPANY,** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

**OPINION**

**Tucker, C.J.**                                                                                    **June 10, 2013**

Plaintiffs, Gary and Beverly Weinberg ("Plaintiffs"), bring this insurance contract action against Nationwide Casualty and Insurance Company ("Nationwide"). Plaintiffs allege that Nationwide, in bad faith, breached its contractual obligations by failing to cover damage to their home. Plaintiffs also allege that Nationwide did not permit them to amend their claim and denied coverage without pursuing a complete and thorough investigation.

Plaintiffs plead two counts: (1) breach of contract; and (2) bad faith conduct in violation of 42 Pa. C.S.A. Stat. § 8371. Nationwide moves for summary judgment, urging that the undisputed evidence of record demonstrates that Nationwide neither breached its obligations under the contract nor exercised any bad faith in resolving Plaintiff's claim. For the reasons set forth below, Nationwide's motion will be granted in part and denied in part.

## I.   Background

### A.   The Insurance Policy

Nationwide issued a homeowners' insurance policy to Plaintiffs for their home in Collegeville, Pennsylvania.  The policy covers accidental direct physical loss to Plaintiffs' home unless the loss is caused by a peril that is excluded. Amongst others, the policy covers "direct loss caused by rain, snow, sleet, sand or dust driven through roof or wall openings made by direct action of wind, hail, or other insured peril."  (See Def.'s Ex. C, Nationwide Homeowner Policy, at p. C1.)

The policy does not cover loss resulting directly or indirectly from "a fault, weakness, defect or inadequacy in the . . . design, workmanship, construction, or materials" if another excluded peril contributes to the loss.  (Id. at p. D2.)  The policy also excludes losses resulting directly or indirectly from: (1) "wear and tear, marring and deterioration," and (2) biological deterioration or damage, [1] "even if another peril or event contributed concurrently or in any sequence to cause the loss." (Id. at p. D1-D3.)

### B.   The Insurance Claim

On June 11, 2010, Plaintiff Gary Weinberg ("Mr. Weinberg") reported to Nationwide that his house had been damaged as a result of a wind or rainstorm, which occurred on or about April 14, 2010.  In making a claim against their insurance policy, Plaintiffs reported that water was seeping into the home and there was water damage in the garage and family room, around the kitchen window, and on the window dressings.  Plaintiffs also reported extra water damage on the walls of the residence and vinyl siding, as well as damage to the stucco on the front

---

[1] "Biological Determination or Damage" is defined on page A2 of the policy as follows:
> 11.  "BIOLOGICAL DETERIORATION OR DAMAGE" meaning damage or decomposition, breakdown, and/or decay or manmade or natural material due to the presence of fungi, algae, lichens, slime mold, bacteria, wet or dry rot, and any by-products of these organisms, however, produced.  Fungi as used above include, but are not limited to: yeasts, mold, mildew, rust, smuts, or fleshy fungi such as mushrooms, puffballs and coral fungi.

exterior of the property.  Nationwide's adjuster, Michael Sigafoos ("Mr. Sigafoos"), inspected

the loss on June 23, 2010 and expressed concerns about coverage for the claims.  He summarized

his findings as follows:

> 0201 COVERAGE DECISION – Unsure of coverage at this time, waiting on
> report form [sic] PH contractor as to cause of damages, Appears water has been
> leaking around and behind windows & vinyl siding.  First discovered in bay
> window located in kitchen, PH had contractor out who caulked around window.
> Then discovered around secondary window in living room, PH called different
> contractor out (rep. & est. waiting on) Believe to be a bigger problem and believes
> that the siding will need to be removed and windows properly flashed.

Plaintiffs advised that their contractor, Lou Luciani of Luciani Builders, Inc., was to inspect the

property and Mr. Sigafoos agreed to wait until the contractor's report was prepared before

arriving at any conclusions regarding the loss.

By letter, dated August 9, 2010, Nationwide denied coverage for the siding and stucco on

the exterior of the property, but provided coverage for interior damage in the amount of $3,

125.28 at replacement cost value.  Applying depreciation of $7.99 together with the deductible of

$1,000 resulted in a net payment of $2,116.40 to the Plaintiffs, which was issued to them on

August 11, 2010.  In the claim determination letter, Nationwide stated:

> We also recognize that you may not be totally in agreement with our estimate of
> your damages.  While we feel that we have written a fair estimate of your
> damages based on the coverage contained in your policy, we would gladly be
> willing to review an itemized estimate of your damages prepared by your
> contractor or representative.  While we are awaiting this estimate, we would still
> like to present you with our payment of $2116.40 today to help you begin the
> repairs and mitigation of your damages.

(See Def.'s Br., Ex. O.)

On August 10, 2010, Mr. Sigafoos made note in Plaintiffs' claim file that he spoke with

Plaintiffs' contractor, Mr. Luciani, who reported that there was a "neighborhood class action

suit" against the home builder of Plaintiffs' home for issues of workmanship, including water

seeping into the home through the stucco and windows.  (See Def.'s Ex. D.)  Mr. Sigafoos also

noted that Mr. Luciani had faxed over his estimate of Plaintiffs' damages to Nationwide.

On October 27, 2010, Mr. Weinberg emailed Mr. Sigafoos an amended proposal by Mr.

Luciani for the exterior work that needed to be completed on his home and requested that

Nationwide contact him with any questions or concerns.  Mr. Sigafoos did not respond.  About

five days later, on November 1, 2010, Mr. Weinberg emailed Mr. Sigafoos again to inform him

that there was water penetration underneath the stucco into the house which became apparent

when the stucco was removed.  Mr. Weinberg noted that Luciani Buliders was at the property

and performing the necessary repairs to the stucco and siding, and that Nationwide was invited to

inspect and evaluate the additional damage.  That same day, Mr. Sigafoos responded, "I'll stop

out quickly this morning."  (See Pl.'s Ex. 1.)  Mr. Sigafoos did not visit Plaintiffs' home until

November 15, 2010.  When he arrived he took additional photos of the exterior damage.

On November 16, 2010, the day following Mr. Sigafoos' visit, Mr. Weinberg sent Mr.

Sigafoos another email informing him of additional damage to the interior walls from the water

seepage and the need to repaint the entire room of the affected areas, which he expected to

exceed the $2,116.40 sent to him in August.  He also welcomed Mr. Sigafoos to come back out

to the home for another inspection.  That same day, Mr. Sigafoos informed Mr. Weinberg, by

email, that he had reviewed the cause of damages to Plaintiffs' home with his manager and,

based on such review, Nationwide maintained its denial of coverage.  Mr. Sigafoos also attached

a formal denial letter, dated November 15, 2010, explaining that Plaintiffs' insurance policy did

not afford coverage for exterior damage sustained to Plaintiffs' home because such damage was

"caused by faulty or inadequate design, workmanship, or construction materials, as well as wear

and tear, aging, or deterioration."  (See Def.'s Ex. J.)  Nationwide further explained that based on

a conversation with Plaintiffs' contractor (Mr. Luciani), they learned that "the water seepage is due to improper installation, workmanship, and construction error, which occurred when the home was originally built" and that "[t]he water seeped through the exterior stucco system, and around the roof and windows due to improper installation and waterproofing." (Id.) As such, Nationwide denied Plaintiffs' claim for additional damage on the basis of the policy exclusions of faulty construction and deterioration.

On December 7, 2010, Mr. Weinberg emailed Mr. Sigafoos about additional repair expenses he incurred for the interior damage covered by Nationwide in August, as well as his total expenses for exterior repairs. Specifically, Mr. Weinberg noted that he received an estimate of $7,975 to paint the rooms with affected areas, and the total cost of repair for the interior and exterior damage was $50,000. In closing, Mr. Weinberg requested a complete copy of his claim file so that he could he could submit objections to Nationwide's disclaimer of coverage.

C.      Homebuilders' Arbitration

Mr. Weinberg testified that he first noticed seeping water around a kitchen window in the fall of 2009 and hired a contractor to caulk the window. (See Def.'s Ex. N, Deposition Transcript of Gary Weinberg, at p. 16 -17.) He later observed the same problem in assorted windows around the house and learned that his neighbors were experiencing similar issues. (Id.) Consequently, Plaintiffs, along with three other families in their community, filed an arbitration claim against the homebuilder, Fieldstone, and the arbitration was held in August 2011. The arbitrator found that the corrective work of the removal and replacement of existing stucco above the front porch line and repair of any water damaged sheathing and framing as well as mold remediation and removal and proper re-installation and flashing of all windows in those stucco

areas as well as the three windows in the kitchen bay area and family room were warranted.  (See

Def.'s Ex. M.)    An award for those damages was made in the amount of $10,827.42.  (Id.)

Plaintiffs' contractor, Mr. Luciani, prepared a report for purposes of the legal proceeding

against the homebuilder.  He discussed the various defects he saw in the Weinbergs' home and

the others in the neighborhood and stated, "it is my professional opinion that there are numerous

factors causing water infiltration issues throughout each house." (See Def.'s Ex. F.)    Mr.

Luciani's report stated the following:

> - Rough Framing – In every home the exterior sheathing was not properly gaped
> at the seams to allow for proper expansion and contraction.  This will cause the
> sheathing to buckle, and crack the stucco allowing water to enter the cracks and
> get behind stucco.
>
> - Stucco Installation- . . . In every home the thickness of the stucco was very thin
> (approximately ¼" to 3/8" thick). Average thickness of stucco is 3/4" to 7/8"
> thick. Only one layer of very thin asphalt paper was installed over exterior
> sheathing, and the seams in many areas were not lapped properly.  No tyvek
> house wrap was installed, seams were not taped, no rain screen system with hydro
> mat installed, no weep hole flashing, no E-Z bead vinyl casing bead installed
> around perimeter of windows and doors, and no [sic] properly made and installed
> properly.
>
> - Roof Flashing and Diverters- In every home the counter flashing was not
> installed properly and the material used was inferior . . . The material that was
> used was a very thin gauge aluminum that reminded me of aluminum foil
> materials . . . The diverter is designed to divert the water from draining down the
> wall line.  In all of these homes we have experienced the worst structural damage
> possible.
>
> -  Window Installation- The quality of windows originally installed is poor.
> Moreover, the installation of windows was poor.  Due to the rough frame opening
> being out of level and bowed in the center, the winder frame flexes causing water
> to enter the interior corners.  There are no weep holes in window frame to allow
> water to escape interior. Window frames are cracked due to pneumatic gun used
> to install stucco wire too close to nail flange.
>
> -  Garage Door Frames- Frames used at garage doors a made of M.D.F. material.
> This material swells up when wet. Drip cap flashing was not installed properly
> over garage door frames. All garage door fames and weather strip is removed and
> replaced with 2X8 Hem Fir caped with aluminum with new weather strip.

## II.    Legal Standard

Summary judgment is appropriate if the movant establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); Levy v. Sterling Holding Co., LLC, 544 F.3d 493, 501 (3d Cir. 2008).  A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Dee v. Borough of Dunmore, 549 F.3d 225, 229 (3d Cir. 2008).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit.  See Fakete v. Aetna, Inc., 308 F.3d 335, 337 (3d Cir. 2002).  The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof.  See Celotex v. Catrett, 477 U.S. 317, 327 (1986).

Once the movant has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).  Under Rule 56(e), the opponent must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings.  See Martin v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007). At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial.  See Jiminez v. All American Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007).  In doing so, the court must construe the facts and inferences in the light most favorable to the non-movant.  See Matsushita, 475 U.S. at 587; Horsehead Indus., Inc. v. Paramount Commc'ns, Inc., 258 F.3d 132, 140 (3d Cir. 2001).

## III.    Discussion

## A.    Breach of Contract[2]

A determination of coverage under an insurance policy is a question of law to be decided by the court.  PECO Energy v. Boden, 64 F.3d 852, 855 (3d Cir. 1995).  "Ordinarily in insurance coverage disputes an insured bears the initial burden to make a prima facie showing that a claim falls within the policy's grant of coverage, but if the insured meets that burden, the insurer then bears the burden of demonstrating that a policy exclusion excuses the insurer from providing coverage if the insurer contends that it does."  State Farm Fire and Cas. Co. v. Mehlman, 589 F.3d 105 (3d Cir. 2009) (citing Koppers Co. v. Aetna Cas. And Sur. Co., 98 F.3d 1440, 1446 (3d Cir. 1996) (applying Pennsylvania law)).  If the insurance contract's language is unambiguous, the Court will simply apply it; if, however, a provision of the contract is ambiguous, it is construed against the insurer, the drafter of the agreement.  Regents of Mercersburg Coll. v. Republic Franklin Ins. Co., 458 F.3d 159, 172 (3d Cir. 2006) (quoting Hutchison v. Sunbeam Coal Corp., 519 A.2d 385, 390 (Pa. 1986)).

Plaintiffs' contend that their amended claims for the damage to the exterior portion of their home are covered under the policy as "reasonable and necessary repairs" to protect the interior property, which Nationwide covered in August 2010, from further damage.  According to Plaintiffs, Nationwide's determination of coverage for the interior damage to the kitchen, family room, and garage was based on a policy provision allowing coverage for windstorm or hail.  This particular provision covers  "direct loss caused by rain, snow, sleet, sand or dust driven through roof or wall openings made by direct action of wind, hail, or other insured peril . . ." (See Def.'s Ex. C, at p. C1.) Believing that the interior damage to their home was covered

---

[2] Because Plaintiffs' arguments are scattershot and confusing, the Court will do its best at addressing each argument raised.

under this windstorm provision, Plaintiffs assert that Nationwide must also cover their amended claims for exterior damage as "reasonable costs you incur for necessary repairs made solely to protect covered property from further damage." (See Def.'s Ex. C, at p. B4.) Unfortunately, Plaintiffs' breakdown of coverage is misguided for several reasons.

First, the record does not support Plaintiffs' claim that Nationwide's initial decision to provide coverage for interior damage to their home was based on the windstorm provision. The August 9, 2010 letter granting partial coverage for Plaintiffs' pending claim does not cite the windstorm provision as the basis for coverage, and neither does the final determination letter of November 16, 2010. Second, Mr. Weinberg's testimony suggests that the water infiltration was not "driven through roof or wall openings made by direct action of wind, hail, or other insured peril," as required under the windstorm provision. Mr. Weinberg testified that he examined the outside of the home following the April 2010 windstorm and did not see any path of penetration for the water to come in. (See Def.'s Ex. N, at p. 36:2-9.) He also stated that there was "no buckling, no ripping, no tearing" and that the siding "looked to be all intact." (Id. at 36:13-14.) Third, Mr. Weinberg's testimony regarding the ongoing issue with water infiltration in the fall of 2009 and his neighbor's similar experience, which ultimately led to the arbitration claim against the property builders, supports Nationwide's position that Plaintiffs' loss occurred over time and not by a single storm event.

Even assuming arguendo that Plaintiff has met its burden of establishing coverage within the policy, Plaintiffs' loss is clearly excluded by the faulty workmanship and deterioration exclusions. By the contract's plain terms, losses that are based on "[a] fault, weakness, defect or inadequacy in the . . . design, workmanship, construction [or] materials" are not covered "if another excluded peril contributes to the loss." (See Def.'s Ex. C, at p. D2.) Based on Mr.

Sigafoos' inspection of Plaintiffs' property and his conversation with Mr. Luciani, Nationwide became aware of poor workmanship issues, including the design, construction, and materials used, regarding the Plaintiffs' home. To substantiate Mr. Sigafoos conversation with Mr. Luciani, Nationwide also relies on a report prepared by Mr. Luciani for the legal proceeding that Plaintiffs initiated against the homebuilders for poor workmanship issues. Interestingly, Plaintiffs do not dispute the veracity of the comments allegedly made by Mr. Luciani to Mr. Sigafoos, but simply deny that any conversation between the two men ever took place. Even more, Mr. Weinberg does not dispute the findings of Mr. Luciani's report regarding the poor construction of the home. Plaintiffs' sole contention is that Nationwide relied on a "verbal, self-serving, self-documented statement from a contractor as to what transpired." However, Plaintiffs fail to acknowledge that this verbal statement was not made by <u>any</u> contractor, but Plaintiffs' contractor. Moreover, the verbal statement was later substantiated when used by Plaintiffs in a legal proceeding to recover damages from ongoing water infiltration. Plaintiffs present no facts in the record from which a reasonable juror could conclude that faulty workmanship was not involved, and all of the record evidence (even that advanced by Plaintiffs) recognizes that water had been seeping into Plaintiffs' home well before April 2010.

Additionally, Nationwide's policy exclusion for deterioration precludes coverage for Plaintiffs' amended claims. In August 2010, Nationwide determined that Plaintiffs' property had been damaged prior to the April 2010 rainstorm based on Mr. Sigafoos' observation of "stucco issues" and "holes in front." (<u>See</u> Def.'s Ex. D, at NW010). Moreover, Mr. Weinberg testified that, once Mr. Luciani began repairs to the property, he discovered a "tremendous amount of water penetration in the front of the house underneath the stucco . . ." (<u>See</u> Def.'s Ex. N, at p. 50:3-6.) He further testified that the siding at the back of the house showed "extensive signs of

10

water damage," including wet insulation and water marks on the plywood. When asked whether there was flakiness in the plywood and if the plywood was discolored, he confirmed that was "correct". (Id. at p. 82:24-83:1-5.) Moreover, in an email to Mr. Luciani, Mr. Weinberg states that he saw "rotted wood under the stucco, under one of the front windows." (See Def.'s Ex. K.)

Plaintiffs do not dispute that the property suffered from deterioration, but argue that such deterioration was caused by the April 2010 windstorm. While the Court does not negate that the April 2010 windstorm had some involvement with Plaintiffs' property damage, the plain language of the policy excludes losses resulting from biological deterioration, "even if another peril or event contributed concurrently or in any sequence to cause the loss." (See Def.'s Ex. C, at p. D1.) Moreover, Plaintiffs bare assertion that the deterioration was caused by the April 2010 windstorm, rather than some other event, does not suffice when trying to raise a triable issue. See Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981) ("[A] party resisting a motion cannot expect to rely on bare assertions, conclusory allegations or suspicions.")

Based on the aforementioned, Nationwide has presented evidence showing that the cause of exterior damage was covered by the policy exclusion. This is sufficient to meet its burden. Because Plaintiffs' scant evidence fails to raise a triable issue of fact as to the cause of the damage to their home, the Court will dismiss the breach of contract claim as to Plaintiffs' amended claims for coverage under the policy.

However, Plaintiffs' do present sufficient evidence to demonstrate a breach of Nationwide's obligation to cover costs incurred by Plaintiffs' for necessary repairs made to protect the covered interior property. In August 2010, Nationwide provided coverage for the interior damage to Plaintiffs' kitchen, family room, and garage. In November, Mr. Weinberg informed Mr. Sigafoos of the possibility of having to paint the entire rooms of the affected areas,

rather than the affected area alone, so that the paint matched. In December, Mr. Weinberg sent

Mr. Sigafoos an estimate of $7,975 from the painter. Yet, Nationwide never responded to this

particular claim of Mr. Weinberg. Given the plain language of the contract's terms, Nationwide

must cover Plaintiffs' costs for the paint job and the Court will, therefore, deny the motion to the

extent it seeks summary judgment in connection with Plaintiffs' claim for repair costs relating to

the covered property.

**B.     Bad Faith Conduct**

The Pennsylvania bad faith statute, 42 Pa. C.S.A § 8371, provides in its entirety:

> In an action arising under an insurance policy, if the court finds that the insurer
> has acted in bad faith toward the insured, the court may take all of the following
> actions:
> (1)  Award interest on the amount of the claim from the date the claim was made
> by the insured in the amount equal to the prime rate of interest plus 3%.
> (2) Award punitive damages against the insurer.
> (3) Assess court costs and attorney fees against the insurer.

To succeed on a bad faith claim, a plaintiff must prove, by clear and convincing

evidence: (1) that the insurer did not have a reasonable basis for denying benefits under the

policy; and (2) that the insurer knew or recklessly disregarded its lack of a reasonable basis in

denying the claim. Nw. Mut. Life Ins. Co. v. Babayan, 430 F.3d 121, 137 (3d Cir. 2005);

Terletsky v. Prudential Prop. & Cas. Ins. Co., 437 Pa. Super. 108, 649 A.2d 680, 688 (Pa. Super.

Ct. 1994). Although the term "bad faith" is not defined in the statute, courts have subsequently

determined that a variety of carrier actions can constitute bad faith, including "a frivolous or

unfounded refusal to pay, lack of investigation into the facts, or a failure to communicate with

the insured." Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co., 193 F.3d 742, 751 n.9 (3d Cir.

1999); see also Terletsky, 649 A.2d at 688. "The 'clear and convincing' standard requires that the

plaintiff show that the evidence is so clear, direct, weighty and convincing as to enable a clear

conviction, without hesitation, about whether or not the defendants acted in bad faith." J.C.

Penney Life Ins. Co. v. Pilosi, 393 F.3d 356, 367 (3d Cir. 2004) (quoting Bostick v. ITT Hartford Group, Inc., 56 F.Supp.2d 580, 587 (E.D. Pa. 1999)) (quotations omitted). "Thus, the plaintiff's burden in opposing a summary judgment motion is commensurately high in light of the substantive evidentiary burden at trial." Pilosi, 393 F.3d at 367 (citing Kosierowski v. Allstate Ins. Co., 51 F. Supp. 2d 583, 588 (E.D. Pa. 1999)); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, (1986) ("we conclude that the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case. This is true at both the directed verdict and summary judgment stages.").

In the present matter, Plaintiffs allege that Nationwide's handling of their claim and denial of coverage constituted bad faith. Plaintiffs specifically argue that (1) Nationwide made the illusory promise that Plaintiffs would be able to submit amended claims for their loss, (2) Nationwide failed to properly investigate Plaintiffs' claims; and (3) Nationwide's actions violated the Uniform Insurance Practices Act (UIPA). In dismissing Plaintiffs' bad faith claim, the Court will address each of Plaintiffs' arguments.

### 1. Illusory promise to amend

Because Plaintiffs' arguments are scattershot, the Court is unsure of whether Plaintiffs' contention is that Nationwide promised to consider their claim upon the amendment of damages or that Nationwide promised to cover their claim upon the amendment of damages. Nonetheless, the Court finds that both arguments are unsupported by the record evidence.

In the August 2010 letter, Nationwide advised Plaintiffs of its coverage position. With respect to repair and replacement costs for the covered damage, Nationwide stated the following:

> Once you complete the repairs or replacement of the items indicated on your structural estimate and/or inventory of contents, the policy you have with us entitles you to collect replacement cost for those items. Just let us know within 180 days when you intend to make the repair or to replace your damages along

with submitting your repair/replacement documentation invoice and we will calculate any recoverable depreciation that you may be due.

Nationwide also advised Plaintiffs that, despite its decision to not provide payment for exterior damage, they were invited to supplement the current claim documents with additional proof of damages as necessary:

We recognize that you may be concerned about the possibility of discovering additional damages once the repairs have begun. We want to assure you that the acceptance of this estimate and check does not prevent you from making an additional claim with Nationwide if additional damages are discovered. If this were to happen, all you would need to do is contact me so I could set up another inspection to determine if the additional damages that you wish to claim are related to this loss and covered under your policy.

Plaintiffs assert that the promises in this letter were "merely words on a page" and Nationwide never permitted them to amend their claim for additional damages. To the extent Plaintiffs' quarrel is with Nationwide's consideration of their amended claims for additional damage, Plaintiff fails to demonstrate how their claims were ignored by Nationwide. On October 27th, Mr. Weinberg emailed Mr. Sigafoos an amended proposal for the exterior damage to his home and asked that Mr. Sigafoos contact him with any questions or concerns. Mr. Sigafoos did not respond with any questions or concerns. On November 1st, Mr. Weinberg emailed Mr. Sigafoos again, alerting him to new damages that Plaintiffs discovered once repairs were started. That same day, Mr. Sigafoos responded, "I'll stop out quickly this morning," but did not visit the property until almost two weeks later. Based on Mr. Sigafoos' inspection of the additional damage, Nationwide maintained its position of denial of coverage for the exterior damage to Plaintiffs' home. As such, the Court is unclear as to where Plaintiffs find support for the position that Nationwide did not consider their amended claim for additional damage.[3]

_____

[3] Plaintiffs claim that Nationwide had no intention on permitting them to amend their claim because, upon making the August 2010 determination, Mr. Sigafoos noted in the claims activity log that Plaintiffs' file would be stored for 2 months and then moved to office storage. The Court is unclear as to how this fact alone demonstrates bad faith on

Plaintiffs also seem to suggest that the August 2010 letter promised coverage for their amended claims. Yet again, it is unclear how Plaintiffs reached such a conclusion. The plain language of the letter explained that (1) Plaintiffs' policy covered any repairs and replacements relating to the covered damages, i.e. the interior damage to the kitchen, family room, and garage; and (2) upon Plaintiffs letting Nationwide know of any additional damages, Plaintiffs could set up another inspection to determine if the additional damages that [they] wish to claim are related to this loss and covered under the policy." As correctly pointed out by Nationwide, this was neither a promise to pay nor a request that the Plaintiffs amend their claim.

### 2. Investigation and handling of claims

Plaintiffs argue that Nationwide acted in bad faith by failing to do a "thorough, full, and reasonable investigation" into their claims. According to Plaintiffs, Nationwide should have secured a contractor or expert report prior to disclaiming coverage, rather than rely on Mr. Luciani's statements. Courts have held that an insurer must "properly investigate claims prior to refusing to pay the proceeds of the policy to its insured." Gold v. State Farm Fire & Cas. Co., 880 F. Supp. 2d 587, 597 (E.D. Pa. 2012) (quoting Bombar v. W. Am. Ins. Co., 932 A.2d 78, 92 (Pa. Super. Ct. 2007)). Bad faith may occur when an insurer makes an inadequate investigation. Corch Const. Co. v. Assurance Co. of Am., 64 Pa. D. & C. 4th 496, 516 (Pa. Commw. Ct. 2003).

The record, however, indicates that Nationwide conducted an adequate investigation of Plaintiffs' claim. Nationwide sent Mr. Sigafoos out to Plaintiffs' home for a visit, wherein he inspected the property and concluded that a coverage determination was uncertain until Nationwide received Mr. Luciani's report. While awaiting Mr. Luciani's report, Nationwide presented Plaintiffs with payment of $2116.40 to help begin repairs and mitigation of damages,

---

the part of Nationwide. Moreover, the mere fact that Nationwide intended to transfer Plaintiffs file to storage is has no bearing on the Courts' analysis since the record clearly demonstrates that Plaintiffs' file remained open during the entire investigatory period.

but assured Plaintiffs' that "acceptance of this estimate and check does not prevent [Plaintiffs']
from making an additional claim with Nationwide if additional damages are discovered," nor
does it "impair or bar any further legal remedy that [Plaintiffs'] may wish to pursue in the
future." (See Def's Ex. O.) Almost three months after accepting Nationwide's check, Plaintiffs'
alerted Mr. Sigafoos to newly discovered damages. Mr. Sigafoos came back out to Plaintiffs'
home to inspect the property, but determined that Plaintiffs' amended claims were caused by
excluded perils. Mr. Sigafoos reached this determination based on his own inspection of the
property, as well as Plaintiffs' contractor's comments regarding faulty workmanship issues
relating to the home. In its November 2010 letter, Nationwide clearly explained why Plaintiffs'
loss to certain parts of their home was not covered by the policy.

Although Plaintiffs strongly argue that this investigatory process was inadequate, they
have produced no evidence that the investigation was conducted in bad faith. In fact, Plaintiffs
fail to acknowledge the distinction between what they desire and what the law requires. While
Plaintiffs repeatedly suggest that Nationwide acted in bad faith when failing to employ an expert
to determine the cause of loss, they provide no legal support for such proposition and fail to
demonstrate exactly how Nationwide's reliance on Mr. Luciani's assessments were inadequate.
As noted above, Plaintiffs' bare assertions of wrongdoing will not suffice at this stage.
Considering Plaintiffs' heightened evidentiary burdening at trial, Plaintiffs have failed to adduce
sufficient evidence from which a reasonable jury could conclude that Nationwide lacked a
reasonable basis for its handling of the claim.

### 3. Nationwide's Compliance with the Unfair Insurance Practices Act (UIPA)

Plaintiffs assert that Nationwide "violated the spirit and intent of the UIPA" when
ignoring Plaintiffs' Oct. 27th and Dec. 7th invitations to visit their property to inspect the

damage; acknowledging Plaintiffs' amended claim more than 10 days after being notified; and not completing its investigation within 30 days after notification.

Courts within the Third Circuit and the Commonwealth of Pennsylvania continue to recognize that the UIPA does not provide plaintiffs with a private cause of action. See, e.g., Leach v. Northwestern Mut. Ins. Co., 262 Fed. Appx. 455, 459 (3d Cir. 2008) ("As the District Court pointed out, there is no private right of action under the UIPA, which can only be enforced by the insurance commissioner."); Connolly v. Reliastar Ins. Co., No. 03-5444, 2006 U.S. Dist. LEXIS 83440, 2006 WL 3355184, at *12 (E.D. Pa. Nov. 13, 2006) ("The case law is abundantly clear that there is not private cause of action under the UIPA . . . ."); Toy v. Metropolitan Life Ins. Co., 2004 PA Super 404, 863 A.2d 1, 14 (Pa. Super. Ct. 2004) ("[O]ur Supreme Court has held that a private cause of action in tort does not lie under the Unfair Insurance Practices Act."). Furthermore, since the Pennsylvania Superior Court's decision in Terletsky v. Prudential Prop. and Cas. Ins. Co., 649 A.2d 680, 688 (Pa. Super. Ct. 1994), which defined "bad faith" in the context of section 8371, courts in this circuit have "refused to consider UIPA violations as evidence of bad faith." See Watson v. Nationwide Mut Ins. Co., No. 11-1762, 2011 WL 4894073, at *4 (E.D. Pa. Oct. 12, 2011) (citation ommitted); Dinner v. United Services Auto Ass'n Cas. Ins. Co., 29 F. App'x 823, 827 (3d Cir. 2002). Therefore, Plaintiffs' reliance on the UIPA is inapposite to its claim for bad faith.

## IV. Conclusion

For the reasons set forth above, Nationwide's Motion for Summary Judgment is granted with respect to Plaintiffs' breach of contract claim to the extent it covers Nationwide's obligation to cover exterior damages. Nationwide's motion is also granted as to Plaintiffs' bad faith claim. However, to the extent Plaintiffs' breach of contract claim covers Nationwide's obligation to

cover incurred costs for Plaintiffs' to repaint the covered interior property, Nationwide's motion

is denied.  An appropriate order follows.